COURT OF APPEALS
DECISION
DATED AND FILED

July 8, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2443-FT**

STATE OF WISCONSIN

Cir. Ct. No. 2009GN10

IN COURT OF APPEALS
DISTRICT III

---

IN THE MATTER OF D. C. R.:

WASHBURN COUNTY,

    PETITIONER-RESPONDENT,

  V.

D. C. R.,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Washburn County: ANGELINE E. WINTON, Judge. *Affirmed*.

¶1 GILL, J.[1] Dwight[2] has been subject to a guardianship of his person and estate and continuous protective placement orders since shortly after suffering

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). This is an expedited appeal under WIS. STAT. RULE 809.17 (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

a traumatic brain injury in 2009. This appeal concerns the most recent order extending Dwight's protective placement for another year.[3] Dwight argues that Washburn County failed to prove by clear and convincing evidence that he continues to meet the standard for protective placement under WIS. STAT. § 55.08(1). We affirm.

## BACKGROUND

¶2 In 2009, Dwight suffered a traumatic brain injury (TBI) in a motorcycle accident, and he has been diagnosed with a "major neurocognitive disorder" as a result of his TBI. Since shortly after the accident, Dwight has been subject to a guardianship of his person and estate and protective placement orders. He is currently protectively placed in a residential group home, where he is permitted five to seven hours of unsupervised activity per day. The residential group home provides, among other services, transportation to and from Dwight's medical appointments, some meal preparation, medication management, and general 24/7 supervision.

¶3 The County petitioned for annual review of Dwight's protective placement in May 2024, and Dwight requested a due process hearing. *See* WIS. STAT. § 55.18 (annual review of protective placement); ***State ex rel. Watts v. Combined Cmty. Servs. Bd. of Milwaukee Cnty.***, 122 Wis. 2d 65, 84, 362 N.W.2d

---

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than his initials. We do the same for Dwight's sister.

[3] Dwight does not raise a challenge to his guardianship in this appeal.

104 (1985). The circuit court ordered Drs. Amber Ebert and Michael Lace, both psychologists, to conduct evaluations of Dwight prior to the hearing.[4]

¶4 At the hearing, Dr. Ebert testified that she performed an in-person examination of Dwight in July 2024. Ebert stated that the examination lasted approximately two hours and that, prior to the examination, she reviewed Dwight's records, including those from his most recent protective placement review and his residential group home records. Ebert also spoke with staff members at the group home, Dwight's guardian of his estate, and Dwight's sister—Kimberly—who is also the guardian of his person.

¶5 During the examination, Dr. Ebert completed four formalized cognitive screening tests with Dwight, and she outlined the results of each test at the hearing. Ebert testified that Dwight's immediate memory—i.e., "his ability to recall things after three to five minutes"—is "in the low-average range," which Ebert characterized as a "relative strength." However, Ebert testified that after "about 30 minutes," Dwight's "ability to retain new information drop[s] fairly significantly" and that his delayed memory is "borderline to mildly impaired."

¶6 Doctor Ebert further testified that Dwight's visual and spatial capabilities are in the borderline impairment range, and his attention and language scores are in the low-average to borderline impairment range. Ebert stated that Dwight's language and communication skills are an "area of relative strength" and that "he has such a strong vocabulary and ability to communicate." However,

---

[4] Prior to the circuit court appointing Dr. Lace to conduct an evaluation of Dwight, the County petitioned, and the court ordered, that Dr. Ebert conduct an evaluation of Dwight. Dwight's counsel requested that Lace be permitted to conduct a second evaluation, and the County did not object.

Ebert also testified that these strengths "can mask some of the underlying deficits" from which Dwight suffers.

¶7 Doctor Ebert also stated that Dwight demonstrated "some impairment in judgment" when it comes to his "ability to reason through and problem solve in situations that we might be faced with on a day-to-day basis." Ebert wrote in her examiner's report, which was admitted into evidence, that individuals with Dwight's level of impaired judgment struggle "in tasks that are considered to be instrumental activities of daily living" and are "more likely to require assistance[] managing transportation, handling finances, grocery shopping, remembering appointments, and effectively managing medication." Ebert testified that Dwight's impaired judgment and executive function are "probably his greatest area[s] of weakness," "especially when it comes to details." She stated that Dwight demonstrates "some knowledge of how to problem solve, but when we get down to the details and what exact steps would you have to take, he demonstrate[s] greater difficulty doing so."

¶8 Doctor Ebert provided several examples of Dwight's impaired judgment and executive function. Specifically, she discussed Dwight's "fairly significant issue with hoarding" and two recent instances where Dwight "has become lost while riding his bike." Concerning the hoarding, Ebert stated that Dwight has three storage units and "there's been issues where he's brought in unsanitary things" to the residential group home. According to Ebert, the unsanitary items have attracted rodents, insects, and other pests into the group home, and Dwight is incapable of "recognizing the potential health and sanitary … hazards" that come with his hoarding practices. With regard to Dwight getting lost twice, Ebert stated that Dwight goes on a bicycle ride at least five times a week and noted that, on two of those bicycle rides within the past year,

Dwight could not find his way back to the residential group home. On one of those occasions, law enforcement became involved to ensure that Dwight returned home safely.

¶9    In addition, Dr. Ebert opined that Dwight lacks insight into his finances and has a "history of losing his debit cards numerous times each month." She also testified that Dwight understood during the examination that he is on prescribed medication, but he "was unaware of what the medications were or what they were for."[5]  Moreover, Dwight informed Ebert that he would not take his prescribed medications if he "liv[ed] on his own" because he does not "find them to be necessary."  Dwight also told Ebert that he would not accept protective services, including help with finances or medication.  Ebert stated that protective services would be insufficient in Dwight's circumstances because such services "typically do[] not include that supervision piece where it's a staffed facility that knows where [Dwight] is and that he's safe."

¶10    Doctor Ebert further noted in her report that Dwight is "fixated on getting his driver's license so that he can operate a motorcycle again. After three failed attempts, he was able to pass the written test and now has a permit." Additionally, Ebert wrote that Dwight's "support[] team" has "significant concerns about him operating a motor vehicle or [a] motorcycle as he has been

---

[5] Dwight's annual written review from May 2024, *see* WIS. STAT. §§ 55.11(1), 55.18(1), was admitted into evidence and lists Dwight's then-current medications as: atorvastatin, venlafaxine ER, quetiapine (a.k.a., Seroquel), mirtazapine, trazodone, venlafaxine, and ibuprofen. Although there was no testimony presented at the 2024 due process hearing—or evidence in Dr. Lace's or Dr. Ebert's reports—regarding the specific purpose of each prescribed medication, Ebert testified that Dwight's medication "helps with agitation per collateral information," Kimberly testified that one of Dwight's medications is for depression, and a social worker testified that Dwight is on medication for high cholesterol and depression.

evaluated by medical providers who have stated that he does not have the cognitive abilities to do so safely." According to Ebert, despite the concerns from medical professionals, Dwight lacks "insight into how his deficits could impact his ability to drive," and, in 2023, "he went to a motorcycle dealer and put a down payment on a motorcycle." Upon learning of Dwight's attempted purchase from residential group home staff, Kimberly contacted the dealership and halted the purchase.

¶11 Doctor Ebert recommended that Dwight's protective placement at the residential group home continue. She opined that Dwight's cognitive deficits from the TBI "are permanent and will not improve" and that "his level of brain healing has reached its capacity." She further explained that Dwight lacks "insight into the fact that he would need assistance" to live independently.

¶12 Doctor Lace testified that he met with Dwight via "teleconference" for approximately 40 minutes in August 2024 as part of his examination. Lace stated that he "did not do any testing per se," and, aside from meeting with Dwight, Lace did not speak with any other relevant individuals, such as staff members at the residential group home

¶13 Doctor Lace stated in his examiner's report, which was admitted into evidence, that Dwight's "[i]nformation processing was slow but generally accurate"; "[p]lanning and problem[ ]solving were weaker than expected, though adequate"; and "[i]nsight and judgment were limited but adequate." Lace further stated that Dwight's short-term memory and overall reasoning ability are "mildly impaired." Lace noted that a 2019 examination of Dwight demonstrated that his "formal IQ" was "within normal limits," but "there were significant concerns with executive functioning" and Dwight's lack of insight into his limitations. Lace

testified that he was not concerned with Dwight's safety due to his "hoarding behaviors" and that a "lot of that seems to be a personal choice as opposed to a mental illness."

¶14    Doctor Lace conceded that he did not ask Dwight "about his medications" and that if someone was not providing Dwight his medications in a packet each day, Dwight might not be able to administer the medications himself. However, Lace testified that he does not believe that Dwight's prescribed medications are "absolutely essential" because there is no threat of violence if Dwight stops taking the medications. Lace further stated that the incidents where Dwight became lost while riding his bicycle did not "seem particularly significant," given the number of "times that [Dwight] didn't get lost." Lace recommended that Dwight's protective placement discontinue.

¶15    Peter Johnson, the program director at Dwight's residential group home, testified regarding one of the incidents when Dwight became lost on a bicycle ride. Johnson stated that staff informed him that they could not reach Dwight and that calls to his cell phone were going to voicemail. It was later determined that Dwight's cell phone was in airplane mode and that he was unable to turn off that mode. Johnson stated that, by chance, Dwight's former job coach saw Dwight at a Subway and called the group home to report his location and inform them that Dwight "needed help." Dwight's social worker testified that residential group home staff had to call law enforcement on the other occasion that Dwight became lost.

¶16    Kimberly testified regarding Dwight getting lost, trying to purchase a motorcycle, and hoarding. Furthermore, Kimberly testified that, when Dwight lived with her shortly after his accident, there were periods when he would not

take his prescribed medications. Kimberly also testified that Dwight recently missed a dental appointment because he was on a bicycle ride and "blew … off" the appointment.

¶17 Dwight also testified at the hearing. He stated that he knows how to take his cell phone out of airplane mode and that he knew how to get home when he was lost, just not without a vehicle and without taking an expressway. Dwight further stated that he has lost two debit cards at a gas station when using an ATM and that he missed the recent dental appointment because he did not "hear" a residential group home staff member remind him of the appointment. Dwight testified that he would continue to take his prescribed medications even without a protective placement order. However, he was unaware which medications he was on—except for Seroquel—or their purpose.

¶18 The circuit court granted the County's petition, finding Dr. Ebert's testimony "considerably more credible" than Dr. Lace's testimony. The court found that Dwight "does not appreciate his deficits and really will not accept services." Further, the court determined that "[t]estimony such as" Dwight losing his debit card, becoming lost, and "not understanding the phone was in airplane mode and how to remove that setting, lead the [c]ourt to believe that he is at risk for exploitation, both financial, and potentially, personally." The court stated that it was "concerned if someone else brought [Dwight] medications or drugs with his name on it, … he would be susceptible to exploitation or suggestion by others." According to the court, Dwight's "issues" with "bicycles and getting lost and missing appointments," "[w]hen considered in totality with Dr. Ebert's report," required continued protective placement in this case. The court also stated that Dwight's need for assistance cannot be met through less restrictive means, including through "support services." Dwight appeals.

**DISCUSSION**

¶19     Dwight argues that the County presented insufficient evidence at the due process hearing to prove, by clear and convincing evidence, that he continues to meet two of the standards for protective placement under WIS. STAT. § 55.08(1).  Specifically, he contends that the County failed to prove that he continues to have "a primary need for residential care and custody" and that he continues to be "so totally incapable of providing for his … own care or custody as to create a substantial risk of serious harm to himself."[6]  *See* § 55.08(1)(a), (c).

¶20     Our review of a protective placement order presents a mixed question of law and fact.  ***Walworth County v. Therese B.***, 2003 WI App 223, ¶21, 267 Wis. 2d 310, 671 N.W.2d 377.  The circuit court's factual findings will not be overturned unless clearly erroneous.  ***Id.***  Whether the evidence satisfies the legal standard for protective placement is a question of law that we review de novo.  ***Id.***

¶21     To order that an individual continue to be protectively placed, a circuit court or jury must find that the individual meets all of the following standards by clear and convincing evidence:

> (a) The individual has a primary need for residential care and custody.

> (b) The individual … is an adult who has been determined to be incompetent by a circuit court.

> (c) As a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable

---

[6] Dwight does not argue that the County failed to prove that he is incompetent or that his brain injury is likely permanent.  *See* WIS. STAT. § 55.08(1)(b), (d).

9

of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others. Serious harm may be evidenced by overt acts or acts of omission.

(d) The individual has a disability that is permanent or likely to be permanent.

WIS. STAT. §§ 55.08(1), 55.10(4)(d), 55.18(3)(e)1. If the court finds that the individual continues to meet the standards under § 55.08(1), "and the protective placement of the individual is in the least restrictive environment …, the court shall order the continuation of the protective placement in the facility in which the individual resides at the time of the hearing." Sec. 55.18(3)(e)1.

## I.  Primary Need for Residential Care and Custody

¶22     Dwight concedes that he needs services for setting up appointments, assisting with meals, and monitoring medications, but he argues that these services are not "daily needs." *See Jackson Cnty. DHHS v. Susan H.*, 2010 WI App 82, ¶17, 326 Wis. 2d 246, 785 N.W.2d 677. Additionally, he argues that these services "are all available outside of protective placement" and can be provided through protective services. *See* WIS. STAT. § 55.01(6r). He also contends that the circuit court discussed his needs when granting the County's protective placement petition, but it never explained "why" there "were needs for *residential* care and custody," as opposed to services that could be provided outside of a custodial setting.

¶23     A "primary need for residential care and custody" under WIS. STAT. § 55.08(1)(a) means that "a person must have a primary need (1) to have his or her daily needs provided for in a residential setting; and (2) to have someone else exercising control and supervision in that residential setting for the purpose of

protecting the person from abuse, financial exploitation, neglect, and self-neglect." *Susan H.*, 326 Wis. 2d 246, ¶16.

¶24    The record demonstrates that sufficient evidence was presented to sustain the circuit court's determination that Dwight continues to have a primary need for care and custody. The court credited Dr. Ebert's testimony in reaching its conclusion that Dwight's daily needs "can't be met through any less-restrictive means such as … support services." The court specifically noted Ebert's testimony that Dwight "does not appreciate his deficits and really will not accept services" outside of a protective placement setting.[7]

¶25    Doctor Ebert's testimony regarding Dwight's refusal to accept services outside of a protective placement setting is supported by other evidence presented at the hearing. Specifically, Kimberly stated that Dwight refused to take his depression medication when he lived with her previously. In addition, Ebert stated in her report that Dwight "has made statements that he would not take medication if living on his own," and even Dr. Lace testified that Dwight does not "really believe he ha[s] any serious conditions."

---

[7] Dwight asserts that the circuit court found that Dwight would not accept services in the guardianship context, not the protective placement context, and that we should not rely on the court's finding because the court also credited Dwight's testimony that he would accept *some* services. We reject these arguments for two reasons.

First, the circuit court expressly credited Dr. Ebert's testimony from the due process hearing, including her testimony that Dwight would not accept protective placement services because he feels like he does not need them. The court's finding was not limited to the court's guardianship analysis. Second, when asked whether there are any services he does need, Dwight stated only "[t]ransportation in bad weather." Dwight did not state that he would accept services beyond transportation in bad weather, including general supervision, medication management, and assistance with making or attending medical appointments. The court found that Dwight's testimony in this respect "does not show a full appreciation for the … assistance that he needs."

11

¶26    The evidence at the hearing also demonstrated, by clear and convincing evidence, that Dwight's current protective placement in a residential setting has furnished supervision critical to providing for Dwight's daily needs, and it has protected him from financial abuse and self-neglect. For example, residential group home staff were the first contact for when Dwight's former job coach found Dwight after he became lost on a bicycle ride. They also called law enforcement to find Dwight on the other occasion when he became lost. Group home staff were likewise able to prevent Dwight, by calling Kimberly, from purchasing a motorcycle, which medical providers have concluded Dwight does not possess the cognitive abilities to safely operate. Moreover, group home staff have stifled the consequences of Dwight's hoarding tendencies by preventing him from introducing unsanitary items, which have attracted pests, into the group home.[8]

¶27    Additionally, residential group home staff prevent Dwight from self-neglect by ensuring that Dwight takes the correct medications, attends his medical appointments, and is not financially exploited. Several witnesses at the due process hearing expressed concern about Dwight taking the correct medication and attending his medical appointments without assistance. Indeed, Dwight had recently missed a dentist appointment even with group home staff reminding him. Dwight stated, with one exception, that he does not know which medications he takes or their purpose. Moreover, Dr. Ebert expressed concern as to whether Dwight could manage his finances on his own given his cognitive impairments.

---

[8] Although the circuit court did not specifically address Dwight's hoarding, the court expressly found that Dwight needs additional support in the residential group home setting, and it is clear from the record that this finding extended to Dwight's capacity for self-neglect, including with respect to Dwight's hoarding tendencies as testified to by Dr. Ebert.

She wrote in her report that Dwight "does not have the ability to budget, or make change. He doesn't demonstrate [an] understanding of knowing if he has enough money to purchase an item."

¶28 Given the foregoing, including the circuit court's finding that Dwight will not accept most services outside of a residential setting, the County presented sufficient evidence that Dwight continues to have a primary need for residential care and custody.

## II. Substantial Risk of Serious Harm

¶29 Dwight also contends that the County failed to prove, by clear and convincing evidence, that as a result of his TBI, he is "so totally incapable of providing for his … own care or custody as to create a substantial risk of serious harm to himself." *See* WIS. STAT. § 55.08(1)(c). The County asserts that it presented sufficient evidence to satisfy this element, contending that Dwight's hoarding, losing his debit card, and failing to take his prescribed medication each satisfy the substantial risk of serious harm standard.

¶30 The "care" alternative in WIS. STAT. § 55.08(1)(c) "means that the person's incapacity to provide for his or her daily needs creates a substantial risk of serious harm to the person or others." *Susan H.*, 326 Wis. 2d 246, ¶17. The "custody" alternative in § 55.08(1)(c), in turn, applies when "the person cannot provide for himself or herself the protection from abuse, financial exploitation, neglect, and self-neglect that the control and supervision by others can provide." *Susan H.*, 326 Wis. 2d 246, ¶17. To meet the standard under § 55.08(1)(c) by clear and convincing evidence, the "risk of harm must be substantial. Mere speculation as to difficulties [the subject] may encounter is not sufficient. Specific harm must be foreseeable to fulfill this requirement. Furthermore, the foreseeable

13

harm must be serious…. [M]inor accidents, injuries and illness are not sufficient to satisfy this requirement." *Zander v. County of Eau Claire*, 87 Wis. 2d 503, 514-15, 275 N.W.2d 143 (Ct. App. 1979).

¶31 Although we ultimately conclude that the County met its burden in this case under WIS. STAT. § 55.08(1)(c) on different grounds, we first address the County's unavailing arguments on this element regarding evidence of Dwight's risk of financial exploitation, his tendency to hoard, and his failure to take medication, as these issues are likely to arise again in Dwight's subsequent protective placement proceedings. On the record before us, this evidence, even when considered together, *does not* show that there exists a substantial risk of serious harm. While this evidence is, as a whole, sufficient to establish that Dwight's "daily needs" must be provided for in a residential setting, it does not follow that the evidence meets the substantial risk of serious harm standard. *See Susan H.*, 326 Wis. 2d 246, ¶¶11-17.

¶32 The County fails to direct this court to any evidence in the record supporting the circuit court's finding that Dwight would take "medications or drugs with his name on it" even "if someone"—presumably an unknown individual, given the context of the court's comment—"brought him" the medication, and the County does not argue that this finding supports the standard under WIS. STAT. § 55.08(1)(c).

¶33 Furthermore, there was no evidence presented at the hearing demonstrating that Dwight's hoarding practices, although "unsanitary," would create a substantial risk of serious harm. *See Outagamie Cnty. DHHS v. L.C.E.*, No. 2023AP929, unpublished slip op., ¶17 (WI App June 4, 2024) (concluding testimony that an individual's apartment was "quite dirty" and that its condition

could worsen if she were not protectively placed was a "vague concern" and failed to meet the standard for a substantial risk of serious harm).[9]  Likewise, the medications prescribed to Dwight appear from the record to be for depression and high cholesterol.[10]  Without additional evidence in the record connecting Dwight's depression or cholesterol to a substantial risk of serious harm, evidence of Dwight not taking his medications outside of a protective placement does not meet the standard under WIS. STAT. § 55.08(1)(c).  *See* ***Clark County v. R.D.S.***, No. 2022AP229, unpublished slip op., ¶¶13-14 (WI App Aug. 18, 2022) (concluding testimony stating, among other things, that an individual might stop taking medication and become "more paranoid" failed to meet the standard for a substantial risk of serious harm).

¶34    We reach this same conclusion with respect to Dwight's inability to independently manage his finances and his losing two debit cards.  There is no evidence in the record demonstrating that Dwight faces a substantial risk of serious harm due to his inability to manage his finances or that he would foreseeably face such harm if someone obtained his debit card.  *See* ***Wood County v. Zebulon K.***, Nos. 2011AP2387, 2011AP2394, unpublished slip op., ¶¶15-16 (WI App Feb. 7, 2013) (concluding evidence that individuals were "unable to prevent financial exploitation" and were "easy to manipulate" failed to meet the standard for a substantial risk of serious harm); *see also* ***Monroe County v.***

---

[9] Unpublished opinions authored by a single judge and issued on or after July 1, 2009, may be cited for their persuasive value.  *See* WIS. STAT. RULE 809.23(3)(b).

[10] The County does not cite evidence in the record demonstrating that Dwight's prescriptions are for any other purpose, and the circuit court did not make a finding in this respect.

*H.K.B.*, No. 2024AP1305-FT, unpublished slip op., ¶¶12-15 (WI App Jan. 16, 2025).

¶35    However, we are satisfied that the County met the standard under WIS. STAT. § 55.08(1)(c) through other evidence that the circuit court relied upon.[11]  Doctor Ebert wrote in her report that Dwight "is fixated on getting his driver's license so that he can operate a motorcycle again.  After three failed attempts, he was able to pass the written test and now has a permit."  Dwight went so far as to put a down payment on a motorcycle the summer before the protective placement hearing.  He was stopped only because residential group home staff discovered his payment and called Kimberly, who then intervened.

¶36    Dwight's desire to purchase a motorcycle, accompanied by his recent attempt to purchase one and his inability to comprehend his cognitive limitations, creates a substantial and foreseeable risk of serious harm.  Doctor Ebert opined that Dwight "has been evaluated by medical providers who have stated he does not have the cognitive abilities to [operate a motorcycle] safely."  In Ebert's opinion, which the circuit court credited, Dwight "does not have insight into how his deficits could impact his ability to drive."  Given Dwight's noted failure to comprehend his deficiencies, it is foreseeable that he could successfully purchase a motorcycle, ride it, and crash it as a result of his TBI.  As evidenced by his 2009 accident, motorcycle crashes plainly pose a substantial risk of serious

---

[11] In issuing its oral ruling, the circuit court considered Dr. Ebert's report, along with testimony about "the issues such as bicycles and getting lost."  We therefore reject Dwight's argument—focusing on the court's earlier statement, when discussing the doctors' credibility, that the court was not focused on "jobs, phones, … bicycles, and medications"—that the court did not address the substantial risk of serious harm element of protective placement.

harm, and Dwight's TBI and accompanying cognitive deficiencies only increase his chances of being in another accident.

¶37 Moreover, the County provided evidence of Dwight getting lost twice while on bicycle rides. On both occasions, Dwight was unable to demonstrate reasoned judgment and seek help. Instead, Dwight had to rely on the residential group home staff, law enforcement, and others to return home safely. It is reasonably foreseeable that if Dwight's protective placement is not continued, he could become lost on his own either while bicycle riding recreationally or attempting to provide for his daily needs—e.g., going to purchase groceries—and not be able to exercise the necessary judgment and problem-solving skills to return home safely. Thus, the County satisfied its burden to show that Dwight's incapacity to provide for his daily needs creates a substantial risk of serious harm to himself and that he cannot provide for himself the protection from self-neglect that is provided in his current placement.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.